UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARK MCGOWAN, individually and as successor-in-interest to Nancy Joyce Garrett, deceased; and DEBORAH BLANCO, individually and as successor-in-interest to Nancy Joyce Garrett,

Plaintiffs,

v.

COUNTY OF KERN, a municipality; and NICHOLAS JOHN CLERICO, an individual,

Defendants.

No. 1:15-cv-01365-DAD-SKO

ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE COMPLAINT

(Doc. No. 81)

This matter is before the court on plaintiffs' motion for leave to amend the complaint. (Doc. No. 81.) A hearing on the motion was held on July 6, 2017. Attorneys Neil Gehlawat and Thomas Seabaugh appeared on behalf of plaintiffs. Attorney James Weakley appeared on behalf of defendant Nicholas John Clerico and Deputy County Counsel Kathleen S. Rivera appeared on behalf of defendant County of Kern. Having considered the parties' briefs and oral arguments, and for the reasons set forth below, the court will grant plaintiffs' motion for leave to amend the complaint.

/////

/////

1

**BACKGROUND**

The proposed second amended complaint alleges as follows:  On September 28, 2014, defendant Clerico, a deputy with the Kern County Sheriff's Office ("KCSO") killed Nancy Joyce Garrett when defendant Clerico's patrol vehicle collided with Ms. Garrett's vehicle at the intersection of China Grade Loop and North Chester Avenue.  (Doc. No. 81-1 at ¶ 2.)  At the time of the collision, defendant Clerico was responding to a "415" call for "disturbing the peace" at the Long Branch Saloon around 1:44 a.m. on the night in question.  (*Id.* at ¶ 50.)  Both Deputy Clerico and several other deputies had indicated they would respond to the initial call.  (*Id.* at ¶ 51.)  At the time he heard the call, defendant Clerico was approximately 1.5 miles away from the Long Branch Saloon.  (*Id.* at ¶ 52.)  At some point after defendant Clerico began responding to the call, the deputy who made the initial "415" call stated "148" over the radio, which refers to an individual resisting, delaying, or obstructing an officer.  (*Id.* at ¶ 50.)  It is unclear at what point during defendant Clerico's journey to the Long Branch Saloon this "148" call went out.

In responding to the call, defendant Clerico reached speeds of 85 miles per hour, more than twice the route's posted speed limit of 35 miles per hour.  (*Id.* at ¶ 53.)  Plaintiffs allege defendant Clerico's speed had no relationship to the particular call to which he was responding.  (*Id.* at ¶ 56.)  As he approached the intersection of China Grade Loop and North Chester Avenue, defendant Clerico did not slow down or otherwise take precautions before he entered the intersection against the red light.  (*Id.* at ¶ 58.)  This intersection had six lights facing in defendant Clerico's direction which had been red for one minute and twelve seconds prior to him entering the intersection.  (*Id.* at ¶¶ 59–60.)  Defendant Clerico collided with the driver's side of Ms. Garrett's car at approximately 85 miles per hour, killing her.  (*Id.* at ¶ 65.)  Clerico was criminally prosecuted in connection with his actions, and pled no contest to misdemeanor manslaughter charges in May 2017.  (*Id.* at ¶ 67.)  The decedent is the mother of the plaintiffs, who bring claims both on their own behalf and on behalf of Ms. Garrett as her successors-in-interest.

Plaintiffs allege that Clerico caused Garrett's death by failing to follow both the training he received and standard police procedures, and by choosing to "participate in a longstanding internal department culture of driving at reckless and irresponsible speeds without due regard for

other drivers or the rules of the road." (*Id.* at ¶ 21.)  Defendant Clerico was trained that he was required to obey the same rules of the road as other drivers, and that, even when engaged in "emergency driving," was still required to drive with due regard for the safety of other drivers. (*Id.* at ¶ 22.)  In particular, he was trained that, even when engaged in emergency driving, "speeds over the posted speed limit were rarely justified and should be avoided." (*Id.*)  Further, he received training that, when entering intersections against a red light, he was to slow his vehicle to the point that he could safely stop in case another vehicle fails to yield the right of way.  (*Id.* at ¶ 23.)  He was also trained to scan the intersection, fluctuate the sound his siren emitted, make eye contact with pedestrians and other drivers before proceeding, and pre-clear each lane of the intersection one lane at a time, both before and as he proceeded through it.  (*Id.* at ¶ 24.)  The deputy was trained that he should stop at red lights even while emergency driving.  (*Id.* at ¶ 27.)

Notwithstanding the County's various written policies addressing this topic, a culture of driving unsafely and at reckless and irresponsible speeds was present with the KCSO, as acknowledged by Sheriff Donny Youngblood.  (*Id.* at ¶¶ 30–31.)  This culture was not adequately addressed by the KCSO or the County until after the collision that killed Ms. Garrett and gave rise to this action.  (*Id.* at ¶ 31.)

Plaintiffs' proposed complaint also cites numerous examples illustrative of this alleged culture within the KCSO.  An audit of the night in question performed by the County showed at least 13 other deputies within the Metropolitan Division of the KCSO driving at reckless and irresponsible speeds on the same night as the collision at issue here.  (*Id.* at ¶ 32.)  These included deputies driving at speeds of 102, 82, 93, 94, 90, 84, 85, 100, 94, 94, 93, and 110 miles per hour, even at time when they were not responding to a call.  (*Id.* at ¶ 33.)

Additionally, another KCSO Deputy, John Swearengin, struck and killed two pedestrians in his patrol car while driving between 70 and 80 miles per hour in a 45 mile per hour zone in 2011.  (*Id.* at ¶ 34.)  Similar to defendant Clerico, Deputy Swearengin—despite pleading no contest to criminal charges in connection with these deaths—remains employed with the department.  (*Id.* at ¶ 35.)

/////

KCSO employees were also involved in numerous vehicle collisions[1] in the years preceding this collision, and were frequently found to be at fault. In 2011, KCSO employees were involved in 91 vehicle collisions, and were determined to be at fault in 56 of them. (*Id.* at ¶ 38.) In 2012, KCSO employees were involved in 95 collisions, and were determined to be at fault in 46 of them. (*Id.* at ¶ 39.) In 2013, 2014, and 2015, employees were involved in 99, 90, and 98 collisions, and were found to have caused 59, 42, and 45 of them, respectively. (*Id.* at ¶¶ 40–42.)[2]

The proposed amended complaint also contains allegations of a history of additional collisions particularly relevant to this case. On November 1, 2010 and July 31, 2013, KCSO deputies were found at fault in causing collisions at the same intersection involved in this case, both of which resulted in injuries. (*Id.* at ¶¶ 68–69.) Additionally, on October 7, 2012 and December 22, 2012, defendant Clerico was personally involved in separate traffic collisions, presumably while on-duty. (*Id.* at ¶¶ 70–71.) He was found at fault in both of these collisions for travelling at an unsafe speed. (*Id.*) Kern County also had the ability to monitor and audit the speeds at which its deputies drove as far back as the year 2006, via a Mobile Data Computer ("MDC") terminal present in each patrol vehicle, which sends "pings" reflective of the vehicle's speed to a centralized system every few seconds. (*Id.* at ¶¶ 43–44.) In the time leading up to the wreck that killed Ms. Garrett, there was a steady increase in deputies traveling at speeds over 80 miles per hour. (*Id.* at ¶ 43.)

Despite all of the above, from 2004 to 2013, only six KCSO employees were disciplined for driving at excessive speeds. (*Id.* at ¶ 45.) This discipline consisted of written reprimands,

---

[1] The court presumes that these figures, as alleged, reflect only on-duty collisions and do not include any collisions KCSO employees were involved in that occurred during off-duty hours.

[2] The proposed second amended complaint also alleges that defendant County of Kern destroyed records relating to deputy-involved traffic collisions for years 2005 to 2010 on June 6, 2016, during the pendency of this case and prior to any claims against the County being dismissed. (Doc. No. 81-1 at ¶ 49.) Plaintiffs have not requested in any manner that the court make a finding that this destruction of records amounts to spoliation, *see, e.g.*, *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011), and the court therefore reads nothing into this factual allegation in connection with the instant motion.

remedial trainings involving self-study and a short quiz, and suspensions of one, two, or five days.  (*Id.*)  However, following the collision that killed Ms. Garrett, Sheriff Youngblood took steps to remedy the problems with reckless driving in the department, and the instances of deputies driving more than 80 miles per hour dropped dramatically.  (*Id.* at ¶ 46.)

Plaintiffs' second amended complaint presents the following causes of action:  (1) a § 1983 substantive due process claim under the Fourteenth Amendment, both on behalf of decedent and on behalf of the plaintiffs for unwarranted interference with their familiar relationship with their mother; (2) a *Monell* claim under § 1983 against the County of Kern for its failure to take adequate measures to redress the practice of its employees recklessly driving at excessive speeds in the period before this collision; (3) a *Monell* claim under § 1983 against the County of Kern for failing to adequately train its sheriff's deputies, including Deputy Clerico, on appropriate procedure for emergency driving; (4) a *Monell* claim under § 1983 against the County of Kern for having a custom, policy, or practice of permitting employees to drive at reckless speeds; and (5) a state law claim for wrongful death.  (*Id.* at ¶¶ 72–115.)

On May 13, 2016, this court granted defendants' motion to dismiss plaintiffs' first through fourth claims listed above without prejudice but without further leave to amend at that time.  (*Id.* at 10.)  In that order, the court noted the claims were dismissed without prejudice so as "not to preclude a future motion to amend the complaint based upon factual information uncovered during discovery." (*Id.* at n.6.)  Consistent with that order, on June 23, 2016, the assigned magistrate judge "ordered that plaintiffs are permitted to conduct discovery on the issue of municipal liability." (Doc. No. 54.)  Defendant Clerico, the driver of the police car involved in the collision was ultimately deposed on May 23, 2017.  (Doc. No. 81 at 19.)  Plaintiffs thereafter filed the instant motion seeking leave to file the proposed second amended complaint ("SAC"), setting forth the allegations summarized above, on June 5, 2017.  (Doc. No. 81.)  Defendants Clerico and County of Kern filed their oppositions to that motion on June 22, 2017.  (Doc. Nos. 83, 84.)  Plaintiffs filed their reply on June 29, 2017.  (Doc. No. 88.)

/////

/////

**LEGAL STANDARD**

Under Rule 15 of the Federal Rules of Civil Procedure, once an answer has been filed, a party may amend a pleading only with leave of court or after obtaining the written consent of the adverse party. *See* Fed. R. Civ. P. 15(a). A court should grant leave to amend freely when justice so requires. *Id.* The Supreme Court has instructed lower courts to heed carefully the command of Rule 15. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). "[R]ule 15's policy of favoring amendments to pleadings should be applied with extreme liberality." *DCD Programs Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (citations and quotations omitted); *see also Price v. Kramer*, 200 F.3d 1237, 1250 (9th Cir. 2000). As the Supreme Court has articulated:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowing the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman*, 371 U.S. at 182*; see also Bowles v. Reade*, 198 F.3d 752, 757–58 (9th Cir. 1999). "Not all of the factors merit equal weight. As this circuit and others have held, it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); *see also Sonoma Cty. Ass'n of Retired Employees v. Sonoma County*, 708 F.3d 1109, 1117 (9th Cir. 2013). "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC*, 316 F.3d at 1052; *see also Sonoma Cty. Ass'n of Retired Employee*, 708 F.3d at 1117. Here, neither defendant argues that amendment here will result in prejudice to them. Instead, both focus solely on the claimed futility and bad faith of the proposed amendment.

**ANALYSIS**

**A.     Futility**

Both defendants argue that the motion for leave to amend should be denied because amendment is futile and is sought in bad faith. Before reaching the substance of these arguments, the court must decide what materials may be considered. Defendants have requested that the

court consider certain pieces of evidence developed in discovery in this case in connection with the pending motion for leave to amend.  (*See* Doc. No. 83 at 6–9; Doc. No. 84 at 5–6.)  Defendant Clerico submits this as a request for judicial notice; defendant County of Kern states that, by attaching certain documents as exhibits to the motion for leave to amend, plaintiffs have thereby incorporated these documents by reference into their complaint.  Plaintiffs oppose the court's consideration of evidence, given the case's current procedural posture.

The test for whether amendment of a complaint is futile is the same as whether a proposed amendment would survive a challenge under Rule 12(b)(6).  *See Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) (noting the "proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6)") (citing 3 J. Moore, Moore's Federal Practice ¶ 15.08[4] (2d ed. 1974)); *Maw v. Bank of Am., N.A.*, No. CV-13-02183-PHX-SRB, 2014 WL 12672640, at *1 (D. Ariz. May 12, 2014) ("[I]n determining whether a proposed amendment is futile, courts are guided by the same standards used when evaluating a Rule 12(b)(6) motion to dismiss."); *Fulton v. Adv. Sales & Mktg., LLC*, No. 3:11–cv–01050–MO, 2012 WL 5182805, at *2–3 (D. Or. Oct. 18, 2012) (concluding the futility standard is based on the plausibility standard under Rule 12(b)(6)); *Energy Intel. Grp., Inc. v. Plains All Am. Pipeline, L.P.*, No. CV 11-10556 PA (SSx), 2012 WL 12893995, at *1 (C.D. Cal. July 9, 2012).  Rule 12(b)(6) tests the legal sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  In ruling on a motion under Rule 12(b)(6), the court is permitted to consider material which is properly submitted as part of the complaint, documents that are not physically attached to the complaint if their authenticity is not contested and the plaintiff's complaint necessarily relies on them, and matters of public record.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).  Material which is not properly considered in a Rule 12(b)(6) motion should not be considered in deciding whether a proposed amendment is futile.  *See Oushana v. Lowe's Home Ctrs., LLC*, No. 1:16-cv-01782-AWI-SAB, 2017 WL 1292717, at *4 (E.D. Cal. Apr. 7, 2017), *findings and recommendations adopted in relevant part*, 2017 WL 2417198 (refusing to consider evidence outside the pleadings in determining whether a proposed amendment was futile);

*Johnston v. Int'l Mixed Martial Arts Fed'n*, No. 2:14–cv–941–JAD–NJK, 2015 WL 273619, at *2 (D. Nev. Jan. 22, 2015) (same).

None of the evidence defendants wish this court to consider would be appropriately considered by the court in addressing a Rule 12(b)(6) motion, and therefore will not be considered in assessing defendants' argument on the futility of amendment here. Defendant Clerico requests that this court judicially notice both his own deposition and the deposition of Deputy Richard Giannelli, who dispatched the 415 and 148 calls at issue in this case. (Doc. No. 83 at 7.) This request is based on a claim that plaintiffs "incorporated deposition testimony into their Proposed Amended Complaint in paragraphs 50, 51, and 52." (*Id.*) First, defendant Clerico's argument confuses the distinct legal principles of judicial notice under Federal Rule of Evidence 201, and the question of what materials may appropriately be considered in addressing a Rule 12(b)(6) motion. While the former is a subset of the latter, *see Lee*, 240 F.3d at 688–89, they are not the same. Most importantly, "a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'" *Id.* at 689 (quoting Fed. R. Evid. 201(b)). The requested facts which defendant Clerico wishes the court to judicially notice are the explanations given by the deputies about why defendant Clerico responded to the call in the way he did on the evening in question. (Doc. No. 83 at 6–9.) These explanations are obviously disputed by plaintiffs and are not the appropriate subjects of judicial notice.

In addition to matters appropriately subject to judicial notice, a court may—as previously indicated—consider "documents" not attached to a complaint "if the documents' 'authenticity . . . is not contested' and 'the plaintiff's complaint necessarily relies' on them." *Lee*, 240 F.3d at 688 (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998)). However, the factual allegations in Paragraphs 50, 51, and 52 of plaintiffs' proposed second amended complaint make no reference to the deputies' depositions. To the contrary, these paragraphs simply allege facts the plaintiffs believe to be true. Presumably, plaintiffs' counsel formed his belief that the alleged facts were true as a result of the deputies' testimony during their depositions. *See* Fed. R. Civ. P. 11 (requiring that attorney only present factual contentions that have or will likely have evidentiary support). However, merely because an attorney relied on evidence to form a belief in

8

the truth of their factual contention does not transform that evidence into "a document" on which the complaint "necessarily relies." *Lee*, 240 F.3d at 688–89. Indeed, typically, the document must be one to which the complaint expressly refers. *See United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011) (holding courts may consider evidence not attached to a complaint if the complaint "refers to *the document*" and "*the document* is central to the plaintiff's claim," and considering reports from Ernst & Young to which the complaint "expressly refers") (emphasis added); *see also Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007–08 (9th Cir. 2015) (considering a deed of trust expressly referenced in the complaint); *Marder v. Lopez*, 450 F.4d 445, 448–49 (9th Cir. 2006) (considering a release of claims that was expressly referenced in the complaint). Depositions are not documents in this sense. In any event, no depositions are expressly referenced in the factual allegations of the plaintiffs' proposed second amended complaint.

Defendant Kern County relies on a similar assertion—labeling this "the doctrine of incorporation by reference"—which the court rejects for the same reasons as stated above. The County makes a separate assertion as well, stating that "the plaintiffs have relied on documents attached as exhibits." (Doc. No. 84 at 5–6.) It appears the County is here referencing the exhibits attached to plaintiffs' motion for leave to amend, which include the proposed second amended complaint, three Excel spreadsheets, and a proposed order granting the motion for leave to amend. (*See* Doc. Nos. 81-1–81-5.) These exhibits are clearly denoted as exhibits to the motion to amend, not to the proposed complaint itself. The court will not consider these exhibits or additional deposition testimony in deciding whether plaintiffs' proposed amendment of their complaint is futile.[3] Indeed, it is unclear why these exhibits are relevant to the motion to amend.

---

[3] Were the court to consider this evidence, it would be forced to convert the opposition to this motion to amend into a motion for summary judgment. As explained, the standard for evaluating a defendant's argument that amendment is futile is the same as evaluating a defendant's motion under Rule 12(b)(6). "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). Neither defendant requests that their opposition to the pending motion be construed by the court as a motion for summary judgment.

1    Whether the proposed amendment is futile is based on the legal sufficiency of the factual

2    allegations set forth in the proposed second amended complaint.

3                    *1.    Plaintiffs' Fourteenth Amendment Claims Against Deputy Clerico*

4          Plaintiffs' proposed second amended complaint alleges two different substantive due

5    process claims under the Fourteenth Amendment, as made actionable under 42 U.S.C. § 1983:

6    (1) a claim on behalf of the plaintiffs themselves for "unwarranted state interference in Plaintiffs'

7    familial relationship with their loved one and family member, Decedent"; and (2) a claim on

8    behalf of decedent based upon her right "to be free from state actions that deprive her of life,

9    liberty, or property in such a manner as to shock the conscience."  (Doc. No. 81-1 at ¶¶ 73, 74.)

10         The seminal case controlling this area of the law is *County of Sacramento v. Lewis*, 523

11   U.S. 833 (1998).  In that case, the Supreme Court noted that the due process clause of the

12   Fourteenth Amendment contains both procedural and substantive limits on government actions,

13   the "touchstone" of which is "protection of the individual against arbitrary action of government."

14   *Lewis*, 523 U.S. at 845–46 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).  "[O]nly the

15   most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" *id.* at 846

16   (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)), and thus government action must

17   be such that it "shocks the conscience" in order to be actionable as a substantive due process

18   claim, *id.* at 846–47.  However, what "shocks the conscience" differs from situation to situation.

19   *Id.* at 850 ("Rules of due process are not . . . subject to mechanical application in unfamiliar

20   territory.").  Thus, in some instances, actions done with "deliberate indifference" will be

21   sufficiently egregious to offend due process.  *Id.* at 849–50 (noting that deliberate indifference to

22   the medical needs of pretrial detainees violates due process).  However, the "deliberate

23   indifference" standard "is sensibly employed only when actual deliberation is practical," and

24   when deliberation is not practical, a higher level of culpability must be present.  *Id* at 851.

25   Therefore, where a police officer confronts "an occasion calling for fast action" which presents

26   "obligations that tend to tug against each other," a higher standard is needed to impose

27   constitutional liability.  *Id.* at 853–54.  Because of this, the Supreme Court has held that "high-

28   speed chases with no intent to harm suspects physically or to worsen their legal plight do not give

rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.*[4]

Since the decision in *Lewis*, courts have grappled with the question of whether "actual deliberation is practical," and thus which standard applies, in various circumstances. Here, the parties again dispute the standard to be applied to the claims brought by plaintiffs against defendant Clerico. On further reflection and given the nature of plaintiffs' allegations, this question appears to be settled in the Ninth Circuit. High-speed car chases are considered the quintessential example of situations in which the "purpose to harm" standard applies. *See Lewis*, 523 U.S. at 854; *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008) (holding that the purpose to harm standard "applies to all high-speed police chases"). The purpose to harm standard applies regardless of whether an "emergency" or "non-emergency" situation gave rise to the police chase, *Bingue*, 512 F.3d at 1177, and regardless of whether the person harmed was being pursued or was merely a bystander, *Onossian v. Block*, 175 F.3d 1169, 1171 (9th Cir. 1999) (reading the decision in *Lewis* to say that "if a police officer is justified in giving chase, that justification insulates the officer from constitutional attack, irrespective of who might be harmed or killed as a consequence of the chase").[5]

---

[4] While *Lewis* concerned the rights of the decedent herself, *see id.* at 837, the Ninth Circuit has applied the same standard to Fourteenth Amendment due process claims brought directly by the decedent's family members. *See Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008) (noting the claims in this lawsuit were "limited to [the plaintiffs'] Fourteenth Amendment rights as [the decedent's] parents").

[5] There was no chase here, high speed or otherwise. Defendant Clerico is instead alleged to have been responding to a call in the course of his duties as a police officer. However, no authority has been supplied by the parties for the proposition that a police officer responding to a call is to be distinguished from a police officer pursuing a fleeing suspect. While one may envision reasons to draw such a distinction, circuit courts to have considered the issue have come to the opposite conclusion. *See Perez v. Unified Gov't of Wyandotte Cty.*, 432 F.3d 1163, 1167 (10th Cir. 2005) (concluding that the purpose to harm standard applies to a firefighter responding to a call); *Terrell v. Larson*, 396 F.3d 975, 979 (8th Cir. 2005) ("[T]he intent-to-harm standard of *Lewis* applies to an officer's decision to engage in high-speed driving in response to other types of emergencies, and to the manner in which the police car is then driven in proceeding to the scene of the emergency."); *Carter v. Simpson*, 328 F.3d 948, 952 (7th Cir. 2003) (applying the purpose to harm standard to a police officer responding to a call). Absent a compelling argument supported by authority, this court will follow these decisions and decline to draw any distinction between high-speed chases and other types of police responses in deciding which standard of law applies. Moreover, while plaintiffs argue the purpose to harm standard should not apply because the call

11

Accordingly, the undersigned concludes that the purpose to harm standard governs this claim.

Unlike many areas of constitutional law, the purpose to harm standard concerns the subjective state of mind of the defendant. *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 458 (9th Cir. 2013) ("[U]nlike in Fourth Amendment cases, Plaintiffs' due process claim is based on a subjective, rather than objective, standard of culpability."); *Terrell*, 396 F.3d at 980 (noting "substantive due process liability is grounded on a government official's subjective intent"); *Ramirez v. City of Oxnard*, No. 2:12–cv–09697–SVW–FFM, 2013 WL 12129396, at *15 (C.D. Cal. July 23, 2013). With that in mind, "[i]t is the intent to inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983 . . . ." *Porter*, 546 F.3d at 1140 (quoting *Davis v. Township of Hillside*, 190 F.3d 167, 172 (3d Cir. 1999)). The Ninth Circuit has held that a "purpose to harm" will therefore be found when a defendant's actions "were undertaken to 'induce . . . lawlessness, or to terrorize, cause harm, or kill." *Id.* at 1141 (quoting *Lewis*, 523 U.S. at 855). A "purpose to harm" can be inferred from the use of force and a lack of "legitimate law enforcement objectives."[6] *A.D.*, 712 F.3d at 456–57; *see also Porter*, 546 F.3d at 1141 (remanding for the assessment of "whether under the totality of the circumstances a jury could infer that [defendant] was acting for purposes other than legitimate law enforcement"); *Bingue*, 512 F.3d at 1177 (finding no purpose to harm because "[n]owhere in the record is there any indication that [defendant] acted with an intent to harm, or had any motive other than a desire to do his job"). Because the state of mind inquiry in

here did not warrant an emergency response, this argument is foreclosed by the Ninth Circuit's decision in *Bingue*, which this court is bound to follow. As will be explained in this order, however, the nature of the call may still be relevant to the ultimate determination of defendant Clerico's state of mind.

---

[6] Permitting this inferential leap is not surprising, as a defendant's subjective intent is rarely the subject of direct evidence in any circumstance, and is almost invariably proved circumstantially. *See, e.g.*, *Skedco, Inc. v. Strategic Operations, Inc.*, 287 F. Supp. 3d 1100, 1144 (D. Ore. 2018) ("[D]irect evidence of a deliberate intent to deceive is rare and thus, indirect and circumstantial evidence may be considered."); *Vasquez v. Atrium, Inc.*, No. 00–1265PHXLOA, 2002 WL 818066, at *7 (D. Ariz. Apr. 24, 2002) ("It is a rare case if direct evidence existed of the employer's intent to violate an employee's civil rights . . . . Therefore, as in most cases, Plaintiff must rely on circumstantial evidence, if any, to prove motive or intent.").

these types of claims is subjective, whether there was an objectively reasonable purpose for which the officer could have acted is at best evidence of the officer's state of mind. *Cf. A.D.*, 712 F.3d at 457 ("Thus, even if an officer's use of force could be justified after the fact by a legitimate objective (such as effectuating arrest) he can still be held liable for a constitutional violation [under the Fourteenth Amendment's due process clause] if he used force for an illegitimate purpose."); *Porter*, 546 F.3d at 1140–41.

Both *A.D.* and *Porter* were police shooting cases in which, at least in some sense, the infliction of harm was obviously intentional. Here, there is no allegation that defendant Clerico was specifically aware Ms. Garrett was in harm's way when he decided to run the red light at 85 miles per hour. Instead, plaintiffs liken defendant Clerico's actions to an officer wantonly shooting into a crowd. (Doc. No. 81 at 24.) Plaintiffs' argument, in essence, is that even if defendant Clerico had no specific design to kill Ms. Garrett, he had no concern that his actions were virtually certain to kill *someone*. No controlling law exists as to whether an officer may be found to have acted with a purpose to harm by acting so wantonly and with such extreme disregard for the consequences of his actions that a jury could find that the behavior shocks the conscience. However, the court concludes that such a state of mind may be appropriately inferred in the right circumstances. Several considerations support this conclusion.

First, in announcing its holding in *Lewis* that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment," 523 U.S. at 854, the Supreme Court cited with approval to the Fifth Circuit's decision in *Checki v. Webb*, 785 F.2d 534 (5th Cir. 1986). In particular, the Supreme Court noted the holding in *Checki* that, "[w]here a citizen suffers physical injury due to a police officer's *negligent use* of his vehicle, no section 1983 claim is stated. It is a different story when a citizen suffers or is seriously threatened with physical injury due to a police officer's *intentional misuse* of his vehicle." *Lewis*, 523 U.S. at 854, n.13; *see also Steen v. Myers*, 486 F.3d 1017, 1024 (7th Cir. 2007) (recognizing the Supreme Court's approval of *Checki* in *Lewis*). The favorable citation to the decision in *Checki* by the Supreme Court in *Lewis* suggests that a law enforcement officer may violate due process by intentionally misusing their vehicle.

Second, the Ninth Circuit has held that the same legal standard applies to due process claims, regardless of who is ultimately injured by the challenged actions. In *Moreland v. Las Vegas Metropolitan Police Department*, the Ninth Circuit confronted a case in which officers responded to a firefight in a parking lot with approximately 50 to 100 people caught in the crossfire. 159 F.3d 365, 368 (9th Cir. 1998). The officers engaged one of the men who was shooting, warned him to cease, and shot him when he failed to stop, after which he crawled away. *Id.* A dead man was subsequently found nearby, and the parties disputed whether he was the officers' intended target or merely a bystander. *Id.* The Ninth Circuit assumed the decedent was merely a bystander. *Id.* at 368 n.1. Nevertheless, the Ninth Circuit concluded the purpose to harm standard applied to the plaintiff's claim. *Id.* at 372–73. Similarly, in *Onossian*, a bystander was injured during a police chase, and the court applied a purpose to harm standard. 175 F.3d at 1172. The question of who was harmed—suspect or bystander—therefore appears to be irrelevant to the inquiry. These holdings support the conclusion that the defendant's intent to harm any particular person is not required, and that it is instead the defendant's intent to do the action and to cause harm generally which sustains liability. *See Porter*, 546 F.3d at 1141 (holding a purpose to harm will be found when a defendant's actions "were undertaken to 'induce . . . lawlessness, or to terrorize, cause harm, or kill'") (quoting *Lewis*, 523 U.S. at 855).

Third, the law commonly implies intentional or malicious states of mind in the presence of sufficiently wanton conduct or actions conducted with knowledge of the high risk of injury. The Supreme Court in *Lewis* alternately described the appropriate mental state for a due process violation as being where a defendant acts "maliciously and sadistically for the very purpose of causing harm." 523 U.S. at 853; *see also Pobursky v. Madera County*, No. 1:07-cv-0611 AWI DLB, 2007 WL 2023529, at *9 (E.D. Cal. July 12, 2007) ("There must be reason to believe that an officer's actions were tainted by an improper or malicious motive."). Implied malice is widely accepted and regularly applied by courts and juries in criminal law. *See, e.g.*, *Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003) (noting that a theory of implied malice requires a jury "find that at the time of the killing the defendant intended to do an act that is dangerous to human life, with the knowledge that the act threatens life, and with a 'conscious disregard' of that threat"); *Angie M. v.*

*Superior Court*, 37 Cal. App. 4th 1217, 1228 (1995) ("[M]alice does not require actual intent to harm."). *See also* 1 Witkin, *California Criminal Law* § 105 (4th ed. 2012) (noting that malice may be found from "an intent to do an act in wanton and wilful disregard of an unreasonable human risk"). Similarly, in tort law, "[i]ntent is not . . . limited to consequences which are desired," but also may be found "[i]f the actor knows that the consequences are certain, or substantially certain, to result from his act." Restatement (Second) of Torts § 8A, cmt. b.[7]

Given the above—(1) that officers may violate due process when they intentionally misuse their vehicle; (2) that the identity of who is injured by the officers' conduct is immaterial to the application of the appropriate legal standard; and (3) that implied malice or intent is commonplace in the law—the court concludes a plaintiff may allege a defendant acted with a purpose to harm where he acted either with actual knowledge or virtual certainty that his actions would cause harm. A jury could reasonably find such alleged actions "were undertaken to 'induce . . . lawlessness, or to terrorize, cause harm, or kill,'" in the absence of legitimate law enforcement objectives. *See Porter*, 546 F.3d at 1141 (quoting *Lewis*, 523 U.S. at 855).

Therefore, the question is whether plaintiffs now allege sufficient facts in their proposed second amended complaint to state a plausible claim that defendant Clerico acted with a purpose to harm, as they contend they have. (Doc. No. 81 at 23–24.) The proposed amended complaint alleges that, in the years preceding this collision, defendant Clerico had twice been involved in traffic collisions for which he was at fault for traveling at unsafe speeds. (Doc. No. 81-1 at ¶¶ 70–71.) On the night in question, defendant Clerico was responding to the Long Branch Saloon pursuant to another officer's call of "415," i.e., "disturbing the peace," and "148," i.e., "resisting,

---

[7]  These cited authorities are exemplary, not exhaustive. In a far wider variety of situations, courts permit or presume inferences of intent to be drawn from the known or virtually certain results of a person's actions. *See, e.g.*, *Claflin v. Commonwealth Ins. Co.*, 110 U.S. 81, 95 (1884) ("[T]he law presumes every man to intend the natural consequences of his acts."); *Wagnon v. State Farm Fire & Cas. Co.*, 146 F.3d 764, 771 (10th Cir. 1998) ("[S]o long as [defendant's] misrepresentations were made knowingly and deliberately, the intent to deceive the insurer will be implied."); *Erlach v. Sierra Asset Servicing, LLC*, 226 Cal. App. 4th 1281, 1300 (2014) ("There is a presumption that a landlord intends the natural and probable consequences of his acts.") (internal quotations omitted); *Travelers Ins. Co. v. Cole*, 631 S.W. 2d 661, 664 (Mo. Ct. App. 1982) ("Intent to harm is inferred if the natural and probable consequences of an act are to produce harm.").

15

delaying, or obstructing an officer." (*Id.* at ¶ 50.) Defendant Clerico and "several other deputies" each indicated they would respond to the call. (*Id.* at ¶ 51.) The Long Branch Saloon was only approximately 1.5 miles from defendant Clerico's then-current location. (*Id.* at ¶ 53.) The posted speed limit was 35 miles per hour. (*Id.*) Nevertheless, defendant Clerico accelerated to 85 miles per hour during the short trip to the Long Branch Saloon. (*Id.*) Another deputy was traveling approximately 300 yards behind defendant Clerico at approximately 70 miles per hour. (*Id.* at ¶ 55.) While en route to the bar, defendant Clerico approached the intersection of North Chester Avenue and China Grade Loop, which had six traffic signals facing him, all of which were red. (*Id.* at ¶¶ 58–60.) These traffic signals were red for one minute and twelve seconds prior to the collision. (*Id.* at ¶ 61.) The road was flat and straight, and the weather was clear, indicating that defendant Clerico knew the lights were red. (*Id.*) Further, the defendant's view of any cross-traffic at the intersection was obstructed by a commercial building, indicating the defendant was aware that he could not know if anyone else was approaching the intersection. (*Id.* at ¶ 60.) Defendant Clerico ran the red light at approximately 85 miles per hour and struck Ms. Garrett's driver's side, killing her. (*Id.* at ¶ 65.) His conduct violated a number of departmental policies. (*Id.* at ¶¶ 22–27, 56–58, 62.) The defendant was subsequently prosecuted in connection with Ms. Garrett's death, and pleaded no contest to misdemeanor manslaughter charges in May 2017. (*Id.* at ¶ 67.)

Plaintiffs allege defendant Clerico acted for no legitimate law enforcement purpose in conducting himself in this manner, and instead simply "participate[d] in the culture of senseless daredevil risk-taking . . . that persisted within the department," "to win the race to the Long Branch Saloon," and to "prove his credentials within the speed culture that was then in effect." (*Id.* at ¶¶ 54–55.) More importantly to resolution of the pending motion, plaintiffs now allege myriad facts indicating there was, in fact, a culture within the KCSO of driving unsafely and at excessively high speeds. (*See id.* at ¶ 31 (Sheriff Donny Youngblood acknowledging a "speed problem" amongst deputies); ¶¶ 32–33 (at least 13 deputies that night were traveling at speeds between 82 and 110 miles per hour, including at least one who was exceeding 100 miles per hour while not responding to any call); ¶ 34 (KCSO Deputy John Swearengin had struck and killed

two pedestrians in 2011 while traveling between 70 and 80 miles per hour in a 45 mile per hour zone); ¶ 35 (Deputy Swearengin pleading no contest to criminal charges in connection with traffic deaths but nevertheless remaining employed); ¶ 36 (statistical data showing deputies regularly drove at speeds exceeding 80 miles per hour); ¶¶ 37–42 (statistics showing KCSO employees were involved in more than 90 collisions per year while on duty between 2011 and 2015, and were typically at fault in about half of them); ¶ 45 (only six employees were ever disciplined for travelling at excessive speeds between 2004 and 2013).)

If proven, these allegations would provide sufficient evidence from which a jury could conclude defendant Clerico acted in a manner that "shocks the conscience" here. More particularly, if these allegations are proven, a reasonable jury could find defendant Clerico acted with a purpose to harm, because he acted in a manner intended to "'induce . . . lawlessness, or to terrorize, cause harm, or kill.'" *Porter*, 546 F.3d at 1141 (quoting *Lewis*, 523 U.S. at 855). Given the totality of the alleged circumstances, *see Porter*, 546 F.3d at 1141, it is plausible defendant Clerico had no "legitimate law enforcement objectives" that would permit him to act in the manner he did. *A.D.*, 712 F.3d at 456–57. The facts now alleged in the proposed second amended complaint, including the exceptionally high rate of speed relative to the posted speed limit, the complete lack of visibility of the intersection, and the obviousness of the danger involved in blindly entering an intersection against a red light travelling at 85 miles per hour, are extreme. Further, those allegations, if proven, could support a finding that the defendant had clear knowledge that his actions were potentially, almost certainly, lethal, given the prior collisions in which both he and other deputies had been involved. Moreover, the nature of the call to which he was responding,[8] coupled with the facts that defendant was only 1.5 miles away and several other officers had indicated they were responding, diminishes the necessity and urgency of defendant Clerico's response. Consideration of all these circumstances could plausibly lead to the conclusion that defendant Clerico acted in the manner he did with the virtual

---

[8] The circumstances surrounding the collision are relevant to determining defendant Clerico's subjective state of mind. *A.D.*, 712 F.3d at 456–58. Considering this does not subvert the holding in *Bingue*, which concerned the legal standard to be employed, not the evidence deemed sufficient to meet that standard. *See Bingue*, 512 F.3d at 1177.

certainty that he would kill someone and for a reason other than a legitimate law enforcement

objective. The court observes that driving a vehicle in a manner that virtually assures someone

will be killed is not dissimilar from indiscriminately firing a gun: if either is done without a

legitimate law enforcement reason to do so, they epitomize an "arbitrary action of government,"

which is the "touchstone of due process." *Lewis*, 523 U.S. at 845 (quoting *Wolff*, 418 U.S. at

558); *see also A.D.*, 712 F.3d at 453; *Porter*, 546 F.3d at 1141.[9]

For all of the reasons explained above, plaintiffs' proposed amendment of their complaint

is not futile in relation to the claim brought against defendant Clerico.

> *3. Plaintiffs' Fourteenth Amendment Claims Against the County of Kern*

In addition to plaintiffs' § 1983 claim against defendant Clerico, plaintiffs also allege

three causes of action against the County of Kern under *Monell v. Dep't of Social Servs. of City of*

*New York*, 436 U.S. 658 (1978). (Doc. No. 81-1 at 1.) More specifically, plaintiffs' first cause of

action alleges that Kern County "knew or reasonably should have known that there was a pattern

of unsafe driving practices and a problem of deputies driving at excessive speeds in the period

leading up to the death of Nancy Garrett," that these practices "posed a menace to public safety,"

and that Kern County "failed to take adequate measures to address these patterns and problems."

(*Id.* at ¶¶ 83–85.) The second of these causes of action alleges the policies of the County "were

not adequate to train its deputies to handle the usual and recurring situations with which they

must deal." (*Id.* at ¶ 95.) Finally, plaintiffs' third *Monell* cause of action alleges that defendant

Clerico acted "pursuant to a longstanding practice or custom of Defendant County," and that the

---

[9] Of course, permitting plaintiffs to amend their complaint is a far cry from concluding they have a meritorious case. It is a near certainty the defendants will seek to produce evidence suggesting defendant Clerico acted out of a genuine desire to perform his duties as an officer, even if it were to be determined he was reckless in the manner he chose to act. Such evidence could undermine plaintiffs' case. However, the question of whether there is sufficient evidence to proceed will be resolved on summary judgment, not in connection with a motion to amend the pleadings. Indeed, most such due process claims are resolved on summary judgment. *See, e.g.*, *Lewis*, 523 U.S. at 839–40 (upholding a dismissal on summary judgment); *Porter*, 546 F.3d at 1142 (reversing district court's summary judgment determination); *Onossian*, 175 F.3d at 1171–72 (same); *Moreland*, 159 F.3d at 374 (affirming summary judgment); *Figueroa v. City of Fresno*, No. 1:15–cv–00349–DAD–BAM, 2017 WL 1255484, at *7–8 (E.D. Cal. Feb. 10, 2017); *Losee v. City of Chico*, No. 2:14-cv-02199-KJM-CMK, 2016 WL 4096444, at *9–11 (E.D. Cal. Aug. 1, 2016); *Garlick v. County of Kern*, 167 F. Supp. 3d 1117, 1163–72 (E.D. Cal. 2016).

County's "deliberate indifference to the foreseeable effects and consequences" of this practice or custom is sufficient to render the County liable. (*Id.* at ¶¶ 104–08.)[10]

The County argues first that plaintiffs' proposed *Monell* claims are futile because no constitutional claim can be stated against defendant Clerico. (Doc. No. 84 at 7.) As indicated above, the court has concluded that the proposed amended complaint does state a cognizable due process claim against defendant Clerico, mooting this argument. Nevertheless, because it is important to understanding the nature of the *Monell* claims, the court will briefly explain why the defendant County's argument is incorrect as a matter of law. *Monell* liability is fundamentally not a species of vicarious liability or respondeat superior liability. *See Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a respondeat superior theory."). Unsurprisingly, therefore, successful § 1983 claims against individual state actors are neither always necessary nor always sufficient to create *Monell* liability against the municipality that employs them. The Ninth Circuit has held:

> Although there are certainly circumstances in which this proposition [that municipal defendants cannot be held liable for violating a plaintiff's constitutional rights if individual defendants cannot] is correct, *see City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) and *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996), it has been rejected as an inflexible requirement by both this court and the Supreme Court.
>
> For example, a municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred. *See, e.g., Chew v. Gates*, 27 F.3d 1432, 1438–39 (9th Cir. 1994). Or a municipality may be liable even if liability cannot be ascribed to a single individual officer. *Owen v. City of Independence*, 445 U.S. 622, 652, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (a "'systemic' injury" may "result not so much from the conduct of any single individual, but

---

[10] Although plaintiffs' proposed amended complaint alleges three separate causes of action under *Monell* against Kern County, each appears to rely on the same theory of liability. In particular, each of these causes of action alleges that the County knew its sheriff's deputies routinely drove at excessive and dangerous speeds, failed to do anything to ameliorate the problem, and was deliberately indifferent in doing so. As discussed further below, *Monell* claims may proceed under two distinct theories, referred to in the Ninth Circuit as policies of action and inaction. It appears each of the causes of action plaintiffs propose to allege here concern a policy of inaction, and plaintiffs bring no claims alleging a policy of action. Since each of these causes of action allege the same theory of *Monell* liability, they will be discussed jointly.

19

from the interactive behavior of several government officials, each of whom may be acting in good faith.") (citation omitted). And in *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002), we explicitly rejected a municipality's argument that it could not be held liable as a matter of law because the jury had determined that the individual officers had inflicted no constitutional injury. *Id*. at 916. "If a plaintiff established he suffered constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983." *Id*. (emphasis in original); *see also Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992).

*Gibson v. County of Washoe*, 290 F.3d 1175, 1186 n.7 (9th Cir. 2002), *overruled on other grounds in Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc); *see also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) ("We have repeatedly held that if a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to liability under § 1983.") (internal quotations and brackets removed); *Fairley*, 281 F.3d at 917 n.4 (noting that "[t]his is true whether the officers are exonerated on the basis of qualified immunity, because they were merely negligent, or for other failure of proof").

"To make out a claim against [a municipality] under *Monell*, [plaintiff] must show that (1) [the municipality] acted under color of state law, and (2) if a constitutional violation occurred, the violation was caused by an official policy or custom of the municipality." *Tsao*, 698 F.3d at 1139. In order to show the second element, a plaintiff must allege either that "the municipality itself violat[ed] someone's constitutional rights or instruct[ed] its employees to do so," or that the municipality is responsible "for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Id.* at 1143 (quoting *Gibson*, 290 F.3d at 1185–86). These are referred to, respectively, as "policies of action and inaction." *Id.*; *see also Lolli v. County of Orange*, 351 F.3d 410, 415 (9th Cir. 2003) (explaining that *Gibson* held there were "two routes" for a plaintiff to show municipal liability, either "by showing that the county itself violated a right or directed an employee to do so, or, in 'limited situations,' by showing that the county's deliberate indifference led to an omission in its policies that caused an employee to

20

violate a right"). "A policy of action is one in which the government body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.'" *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (quoting *Tsao*, 698 F.3d at 1143). Thus:

> In inaction cases, the plaintiff must show, first, that the policy amounts to deliberate indifference to the plaintiff's constitutional right. This requires showing that the defendant was on actual or constructive notice that its omission would likely result in a constitutional violation. Second, the plaintiff must show that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy.

*Id.* (quotations, citations, and brackets omitted). Policies of inaction may be alleged solely against a municipality, regardless of whether any individual employees of that municipality are liable. *See Tsao*, 698 F.3d at 1139; *Gibson*, 290 F.3d at 1186 n.7; *Fairley*, 281 F.3d at 917 n.4; *M.H. v. County of Alameda*, 62 F. Supp. 3d 1049, 1082, 1085 (N.D. Cal. 2014). Whether an individual state actor must be found to have violated the plaintiff's constitutional rights depends on the circumstances of the case and the nature of the constitutional violation alleged. *See, e.g.*, *Heller*, 475 U.S. at 799 (concluding a plaintiff could not state a *Monell* claim concerning police excessive force against a municipality where no officer had subjected him to constitutionally excessive force); *Quintanilla*, 84 F.3d at 355 (same).

The logic behind the theory that a policy of inaction can create constitutional liability for a municipality comes from the Supreme Court's holding in *City of Canton v. Harris*, 489 U.S. 378 (1989). In *City of Canton*, the Supreme Court considered a facially constitutional policy concerning the provision of medical services to detainees at a local jail. *Id.* at 386–87. It held that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Id.* at 387. In that case, a jury found no liability against any individual officers. *Id.* at 382. The Court nevertheless concluded the jury's liability decision against the City could stand, holding that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. In so holding, the Court

observed:

> The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (footnotes omitted). The Ninth Circuit has relied upon *City of Canton*, in holding that, in order to find a municipality liable, a plaintiff must show that the deprivation of a constitutional right was closely related to a "custom" or "policy" of that municipality and that the policy "evidences a deliberate indifference" to the plaintiff's constitutional rights. *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (internal quotations omitted).

Here, plaintiffs have alleged sufficient facts in their proposed second amended complaint to state a plausible claim against the County of Kern for having a policy of inaction, irrespective of any claim against defendant Clerico. The decedent enjoyed a substantive due process right not to be deprived of her life or liberty in a manner that shocks the conscience. *Lewis*, 523 U.S. at 846; *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) (describing arbitrary government actions which violate due process as "conscience shocking"); *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (holding substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty'). Similarly, the plaintiffs personally held a substantive due process right not to be deprived of their familial relationship with decedent. *Lee*, 250 F.3d at 685–86; *Moreland*, 159 F.3d at 371; *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). The proposed second amended complaint contains factual allegations that KCSO deputies routinely drove at excessive speeds, both while responding to calls and otherwise. (Doc. No. 81-1 at ¶¶ 32–33, 36.) It also alleges specific facts

indicating that KCSO deputies were regularly involved in a number of on-duty vehicle collisions every year, and that approximately half the time, KCSO's deputies were at fault. (*Id.* at ¶¶ 37–42.) Twice within the years immediately preceding the collision in question, KCSO deputies caused collisions in which they were found to be at fault at the very same intersection that Ms. Garrett was killed in. (*Id.* at ¶¶ 68–69.) Defendant Clerico himself twice caused collisions prior to Ms. Garrett's death while on duty, and in each he was found to be at fault for driving at unsafe speeds. (*Id.* at ¶¶ 70–71.) The County was aware of the dangers presented by these collisions, because another deputy had struck and killed two pedestrians while travelling at an excessive rate of speed in his patrol car. (*Id.* at ¶ 34.) Further, the County had the ability to monitor the speeds all of its deputies traveled at in their cars and to perform speed audits. (*Id.* at ¶¶ 32, 43–44.) Despite these substantial allegations that excessive speeds were a regular and frequent occurrence within the department, only six deputies were disciplined for driving at excessive speeds between 2004 and 2013. (*Id.* at ¶ 45.) The discipline that was imposed was minimal, consisting of written reprimands, remedial self-study training, and short suspensions of one, two, or five days. (*Id.*) These allegations, if proven, plausibly support an inference that the County of Kern had a policy or custom of either failing to adequately train or permitting its sheriff's deputies to regularly drive at excessive speeds, that this manner of driving frequently caused traffic collisions, that such collisions could be and sometimes were fatal, and that the County was deliberately indifferent[11] to the serious risk of these fatalities. Therefore, plaintiffs' proposed amendment to their complaint in order to state a *Monell* claim premised on Kern County's policies is not futile.[12]

---

[11]  The court notes that the purpose to harm standard is not appropriately applied to plaintiffs' *Monell* claim against the County. While the Supreme Court has held that an officer's actions must demonstrate a purpose to harm in a rapidly developing situation in order to shock the conscience, a municipality's policy decision about how to train and discipline officers is not made in the heat of the moment. Instead, such a decision is exactly the kind of situation in which "actual deliberation is practical." *See Lewis*, 523 U.S. at 851–853. Therefore, the County's requisite state of mind is one of deliberate indifference, consistent with the standard set forth for policies of inaction. *See id.*; *City of Canton*, 489 U.S. at 388; *Oviatt*, 954 F.2d at 1477.

[12]  The County again requests that this court delve beneath the pleadings and examine evidence in deciding whether plaintiffs' proposed amendment is futile. (*See* Doc. No. 84 at 11–14.) Specifically, defendant asks the court to take notice of and consider the explanations given by a

**B.     Bad Faith**

Additionally, both defendants suggest that plaintiffs' motion to amend their complaint is brought in bad faith.  (Doc. No. 83 at 1; Doc. No. 84 at 2.)  Evidence outside of the pleadings may—indeed, must—be considered by the court in evaluating whether a party is acting in bad faith in seeking leave to amend their complaint.  *See Sonoma Cty. Ass'n of Retired Emps. v. Sonoma County*, 708 F.3d 1109, 1117 (9th Cir. 2013) ("Courts may decline to grant leave to amend only if there is *strong evidence* of 'undue delay, bad faith or dilatory motive on the part of the movant . . .'") (quoting *Foman*, 371 U.S. at 182) (emphasis added); *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987) (overturning a district court's denial of leave to amend on the basis of bad faith because "the record . . . offers no evidence of bad faith").  However, the evidence defendants wish the court to construe as evidence of bad faith here is essentially the sort of evidentiary dispute germane to all litigation proceeding before this court.  For instance, defendant Clerico claims the plaintiffs have acted in bad faith because they did not allege that defendant Clerico "responded Code 3 to his partner's scared and stressful call for help," which was part of the explanation for his conduct provided by the defendant in his deposition.  (Doc. No. 83 at 9.)  Similarly, defendant County of Kern asserts bad faith is shown because plaintiffs failed to accept Lieutenant Jauch's explanation that that there may be legitimate reasons for KCSO deputies to be traveling at more than 80 miles per hour, such as "the flow of traffic."  (Doc. No. 84 at 12–13.)  Reasonable disputes about what certain evidence means are not a basis on which to find a party has acted in bad faith, and plaintiffs are not required to allege the defendants' version of the facts in their complaint.  Neither defendant has made a showing, let alone one supported by "strong evidence," that plaintiffs acted in bad faith in moving to amend

---

Lieutenant Jauch about the meaning behind some of the facts and figures alleged in plaintiffs' proposed amended complaint.  (*Id.* at 12) ("[T]he County submits under the doctrine of incorporation by reference . . . the County can use the testimony of Lt. Jauch in opposing this motion.").  As explained above, consideration of evidence outside the pleadings is inappropriate in evaluating whether amendment is futile, and none of the discovery pointed to by defendant is "a document" on which the complaint "necessarily relies."  *Lee*, 240 F.3d at 688–89.  Defendants will have ample opportunity to file motions for summary judgment in this action, and this court will consider the evidence supporting plaintiffs' claims at that time.

their complaint here. *See Sonoma Cty. Ass'n of Retired Emps.*, 708 F.3d at 1117.

## CONCLUSION

For all of the reasons set forth above:

1.  Plaintiffs' motion to amend the complaint (Doc. No. 81) is granted;

2.  The Clerk of the Court is directed to file the proposed second amended complaint (Doc. No. 81-1) on the docket captioned as the second amended complaint, which is deemed filed as of the date of this order; and

3.  The case is referred back to the assigned magistrate judge for scheduling and further proceedings consistent with this order.

IT IS SO ORDERED.

Dated:  __**June 7, 2018**__

_____
UNITED STATES DISTRICT JUDGE